**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: May 7 2015**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 13-34137 |
| | ) | |
| Robin L. Horvath, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

**MEMORANDUM OF DECISION AND ORDER REGARDING TRUSTEE'S MOTION
FOR A DETERMINATION REGARDING ATTORNEY-CLIENT PRIVILEGE**

This case is before the court on the Chapter 7 Trustee's Motion for a Determination Regarding Alleged Attorney-Client Privilege Between Debtor and Petitioning Creditors ("Motion") [Doc. # 158] and Supplement to the Motion [Doc. # 160], Debtor's response [Doc. # 163], Petitioning Creditors' response [Doc. # 164], and Fifth Third Bank's memorandum in support of the Motion [Doc. # 165].

In her Motion, the Trustee seeks a determination that an attorney client relationship does not exist between Debtor and Thomas A. Matuszak and his law firm Thomas A. Matuszak, LLC and between Debtor and Troy Moore and his law firm Ballenger & Moore Co., L.P.A. or, if such relationships exist, whether the Trustee can waive the privilege for the limited purpose of evaluating assets identified in recently filed amendments to Debtor's bankruptcy Schedule B. Fifth Third Bank ("Fifth Third") asks the court for a determination that the Trustee's waiver applies to any pre-petition communications with Matuszak and Moore and any work-product privilege that may be claimed. The court held an evidentiary hearing on April 30, 2015, on the issue of the existence of the challenged attorney-client relationships and thereafter took the

Motion under advisement.

## FACTUAL BACKGROUND

On October 7, 2013, Petitioning Creditors, consisting of Thomas A. Matuszak, LLC and Ballenger & Moore Co., L.P.A., (together, "M&M"), Debtor's prepetition lawyers, and Matuszak & Koder, Ltd, an accounting firm, filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against Debtor Robin Horvath. The court entered an order for relief on December 23, 2013. Debtor filed his bankruptcy schedules on February 28, 2014. The § 341 meeting of creditors was concluded on March 10, 2014. Debtor received a Chapter 7 discharge on May 14, 2014.

Beginning in 2010, M&M, and specifically, Thomas A. Matuszak ("Matuszak") of the law firm Thomas A. Matuszak, LLC and Troy Moore ("Moore") of the law firm Ballenger & Moore Co., L.P.A., represented Debtor in years of state court litigation involving a number of cases and claims against a number of parties, stemming from Debtor's fifty percent ownership of Tony Packo's Inc., Tony Packo Food Company, LLC, Packo Properties, LLC, and Magyar Holdings, LLC ("the Packo Companies), which are the subject of a state court receivership proceeding ("Receivership Proceeding"), and from disagreements amongst the owners and his partial personal guaranty of the companies' debts owed to Fifth Third, a secured creditor of the Packo Companies. The state court litigation is more fully described a prior decision of this court.[1] The court summarizes the state court litigation as follows: the Receivership Proceeding regarding the Packo Companies in the Lucas County, Ohio, Court of Common Pleas and appeal in the Sixth District Court of Appeals of the order confirming the receiver's sale of assets of the Packo Companies ("the Appeal"), which are stayed due to the filing of this bankruptcy case; Debtor's complaint against the Receiver Steve Skutch and Greg Waina, who worked for the Receiver, and others, alleging that his employment was terminated in retaliation for Debtor's whistleblowing activities relating to Tony Packo III and Cathleen Dooley, controller of Packo's Inc.; Debtor's complaint against Tony Packo III, Tony Packo, Jr., and Cathleen Dooley, alleging tortious interference with business and contractual relationships between or involving Debtor and Fifth Third; and Fifth Third's judgement lien foreclosure suit against real property owned by Debtor and Debtor's motion filed in that case for leave to file counterclaims against Fifth Third for tortious interference with its own business and contractual relationships with Debtor and the Packo Companies.

On October 4, 2013, three days before filing the involuntary petition, M&M filed notices of

---

[1] Specifically, the state court litigation is more fully described in the court's Memorandum of Decision Denying Motion to Approve Compromise [Doc. # 126].

withdrawal as counsel for Debtor, his wife Terrie Horvath, and their entity Nancy Packo, LLC, in connection with all of the pending cases in the Lucas County Court of Common Pleas. The court treated the notices as motions and took them under advisement. On the same day, M&M filed motions to withdraw as counsel for Debtor, his wife, and Nancy Packo, LLC, in the Sixth District Court of Appeals. The court granted the motions as to Terrie Horvath and Nancy Packo LLC but held in abeyance any ruling as to Debtor in light of the automatic stay.

On October 4, 2013, Moore also filed suit against Debtor in Wood County, Ohio, to collect unpaid attorney fees, in which Matuszak's law firm moved to intervene. The fee collection lawsuit was subsequently stayed pending the conclusion of this bankruptcy case. Although Debtor testified that he is aware of the fact that Moore sued him and that Matuszak is also involved in that lawsuit, he testified that he has taken no action to oppose M&M's requests to withdraw as his counsel in the Appeal and in the trial court proceedings and has taken no action himself to terminate their representation. The law firms of both Moore and Matuszak are unsecured creditors in this bankruptcy case, having filed proofs of claim in the total amount of $817,523.33.

On January 13, 2015, the court held an evidentiary hearing on the Trustee's motion to approve a compromise with respect to the majority of the state court litigation. The evidentiary hearing was concluded after a recess during which the parties entered into discussions amongst themselves that led to the court being informed of the possibility of objections to the motion being resolved. The court was later informed that the objections were not resolved, and the court denied the Motion on March 3, 2015, although for reasons other than those raised in the objections.[2]

In the meantime, on February 10, 2015, Debtor filed an amended Schedule B, asserting for the first time in this case that he has assets from the probate estate of his mother, Nancy Packo Horvath, including a License Agreement that addresses rights with respect to recipes for Tony Packo hot dog sauce and chili soup ("Recipes"). Amended Schedule B also includes for the first time potential claims against the Receiver Steve Skutch and Greg Waina, potential claims against Fifth Third "for violation of various banking and underwriting rules and regulations," and potential claims against the law firm Robison, Curphey and O'Connell and attorneys Mark Ozimek and Michael Messenger for failure to protect the assets of Tony Packo's Inc. ("Legal Malpractice Claim"). [Doc. # 119, pp. 4-5].

According to Debtor, his amended Schedule B is the result of information he learned at the January

---

[2] The court denied the Motion to Approve Compromise without prejudice because of certain ambiguities and internal inconsistencies that the court found made it susceptible to continued, and perhaps protracted, litigation as to its meaning and implementation. [Doc. # 126, pp. 19-20].

3

13, 2015, hearing and the discussions that occurred during the recess at that hearing. He testified that, after the hearing, he asked his bankruptcy attorney for and was given permission to speak with Matuszak and Moore. He testified that he had one meeting that both Matuszak and Moore attended, after which "the majority of the meetings" were with Moore. [Doc. # 168-15, p. 316]. At the hearing on the Trustee's Motion, Debtor testified that the purpose of those meetings was to "gather information from" Matuszak and Moore regarding information he learned at the January 13 hearing.

In light of Debtor's amended Schedule B and an affidavit Petitioning Creditors attached to their motion to disqualify counsel for the Trustee that was prepared by Debtor regarding gross profit from sales of Tony Packo's hot dog sauce and chili soup, both the Trustee and Fifth Third filed motions for a Rule 2004 examination of Debtor, which the court granted. The court ordered Debtor to appear for examination and produce any and all documents supporting the assets identified in his amended schedules, including the Nancy Packo Horvath Living Trust[3] and documents relating thereto, and any and all documents supporting Debtor's affidavit.

The Rule 2004 examination took place on April 10, 2015, but was not concluded because Debtor testified that he had voluminous files that he had not yet reviewed in connection with his obligation under the court's order to produce documents. At the examination, Debtor refused to testify regarding the content of discussions with Matuszak and Moore relating to the assets included on his amended Schedule B based upon the attorney-client privilege. The attorney-client privilege was also asserted on Debtor's behalf with respect to those discussions by both his bankruptcy attorney and by Matuszak.

Although Debtor testified at his Rule 2004 exam that he did not expect that Matuszak and Moore would be involved "with [his] bankruptcy issues at all," after a discussion with his bankruptcy attorney, he testified that he does want them to be his counsel with respect to his amended Schedule B. [*Id.* at 379, 380-81]. However, he testified that he has no contract or engagement letter with either Matuszak or Moore for services after January 13, 2015, and there was no discussion with them regarding compensation for any services after that date. At the hearing on the Trustee's Motion, Matuszak testified that he and Moore do not represent Debtor in this bankruptcy proceeding.

## LAW AND ANALYSIS

In her Motion, the Trustee seeks a determination that an ongoing attorney-client relationship does not exist between Debtor and Matuszak and Moore that would support the existence of any privileges with

---

[3] The Trustee reported that she learned of the Trust in investigating the Nancy Packo Horvath probate estate identified in Debtor's amended Schedule B.

4

respect to their post-petition communications and work product. Alternatively, although the Trustee acknowledges that she is presently engaged in a review of Debtor's conduct in relation to revocation of discharge under § 727(d), in the event the court finds an attorney-client relationship exists, she seeks to waive both the attorney-client privilege and any work-product protection only to enable her to explore with Debtor, Matuszak and Moore, the legal theories and factual bases underpinning the assets listed in amended Schedule B, including the Recipes and assertions of their value suggested in Debtor's affidavit. She does not seek to waive any privilege with respect to questions relating to the revocation issue, such as, why the newly scheduled assets were not previously included in Debtor's schedules or in testimony at the § 341 meeting of creditors and issues relating to the incomplete disclosure of documents.

### I. Attorney-Client Relationship

In *New Destiny Treatment Center, Inc. v. Wheeler*, 129 Ohio St. 3d 39 (2011), the Ohio Supreme Court addressed the issue of when an attorney-client relationship exists as follows:

> To determine whether an attorney-client relationship exists, the law looks to the manifest intentions of the attorney and the prospective client. A relationship of attorney and client arises when a person manifests an intention to obtain legal services from an attorney and the attorney either consents or fails to negate consent when the person has reasonably assumed that the relationship has been established. Thus, the existence of an attorney-client relationship does not depend on an express contract but may be implied based on the conduct of the parties and the reasonable expectations of the putative client.

*Id.* at 44 (internal citations omitted). The type of evidence necessary to support a determination as to whether an attorney-client relationship exists may vary with the circumstances. *Henry Filters, Inc. v. Peabody Barnes, Inc.*, 82 Ohio App.3d 255, 26 (1992). The test is essentially "whether the putative client *reasonably* believed that the relationship existed and that the attorney would therefore advance the interests of the putative client." *Id.*; *Cuyahoga Cty. Bar Assn. v. Hardiman*, 100 Ohio St.3d 260, 263 (2003) ("The determination of whether an attorney-client relationship was created turns largely on the reasonable belief of the prospective client"); *Lemley v. Kaiser*, No. 1804, 1987 WL 10774, *5 (Ohio App. April 30, 1987) "belief of the parties that an attorney-client relationship exists is not sufficient to create the relationship unless their state of mind is reasonably induced by representations or conduct of the attorney; they cannot establish is unilaterally"). An "essential element as to whether an attorney-client relationship has been formed is the determination that the relationship invoked such trust and confidence in the attorney that the communication became privileged and, thus, the information exchanged was so confidential as to invoke an attorney-client privilege." *Thompson v. Karr*, 182 F.3d 918 (Table) (6th Cir. July 15, 1999) (quoting *Landis v. Hunt*, 80 Ohio App.3d 662, 669(1992)); *Lillback v. Metro. Life Ins. Co.*, 94 Ohio App. 3d 100,

109 (1994).

In this case, the court finds that no attorney-client relationship exists between Debtor and Matuszak and Moore with respect to the potential claims against Fifth Third for violation of banking and underwriting rules and regulations and potential claims against the law firm Robison, Curphey and O'Connell and attorneys Ozimek and Messenger for failure to protect the assets of Tony Packo's Inc. In asserting such relationship, Debtor relies on his relationship with M&M with respect to their representation of him in the state court proceedings. While the factual bases of these potential claims may have arisen prepetition, the only claims that Debtor attempted to assert against Fifth Third prepetition were claims for tortious interference with Fifth Third's business and contractual relationships with Debtor and the Packo Companies. And there is no evidence that Debtor asserted in state court, or that M&M represented Debtor with respect to, any claim against Robison, Curphey and O'Connell and attorneys in that law firm.

Moreover, the court finds that Debtor did not reasonably believe that such relationship existed with respect to those claims. Debtor is represented by separate bankruptcy counsel in this case. Debtor testified that he sought permission from his bankruptcy attorney to speak with Matuszak and Moore and that the purpose of his discussions with Matuszak and Moore after the January 13, 2015, hearing was to "gather information" regarding what he heard at that hearing. At his 2004 examination, Debtor testified that he did not expect Matuszak and Moore to be involved with his bankruptcy issues at all. Of course, pursuit of the potential Legal Malpractice Claim and potential claim against Fifth Third are issues in his bankruptcy case. And, in fact, Matuszak testified that he and Moore do not represent Debtor in this bankruptcy proceeding but that they believe they have a continuing duty to represent him as to claims asserted in the state court.

There is no dispute that an attorney-client relationship existed between Debtor and Matuszak and Moore in their representation of him in all of the state court matters. Those matters include the Receivership Proceeding, during which ownership of the Recipes was an issue, and the pending Appeal of certain issues relating to the Receivership Proceeding, which Matuszak asserts includes the trial court's determination that the Recipes were assets of the Receivership. Although M&M filed motions to withdraw from representation of Debtor in all of the state court proceedings, including the Appeal, those motions have not yet been granted. There exists the unusual circumstance that M&M have sued Debtor in state court to collect unpaid attorney fees and commenced this involuntary bankruptcy case against him for the same reason. However, any professional ethical obligations resulting therefrom do not by themselves terminate the attorney-client relationship. *Cf. Pfizer v. Stryker Corp.*, 256 F. Supp. 2d 224, 226-27 (S.D.N.Y. 2003) (denying the defendant's motion to disqualify plaintiff's counsel because the law firm had filed suit against the plaintiff).

6

13-34137-maw    Doc 179    FILED 05/07/15    ENTERED 05/07/15 16:07:43    Page 6 of 12

The court, therefore, finds that Debtor's attorney-client relationship continues with respect to issues raised in the state court litigation.

## II. Attorney-Client Privilege

The Federal Rules of Evidence require the court to use federal common law in addressing a claim of privilege except with respect to a claim or defense for which state law supplies the rule of decision. Fed. R. Evid. 501; Fed. R. Bankr. P. 9017. Where the trustee seeks to determine information relating to potential claims and assets of the bankruptcy estate, federal common law applies. *Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1264-65 (10th Cir. 1999); *Moore v. Eason (Bazemore)*, 216 B.R. 1020, 1022-23 (Bankr. S.D. Ga. 1998) (citing Fed. R. Bankr. P. 2004 and Fed. R. Evid. 501). The burden of establishing the protection of the attorney-client privilege rests with the person or entity asserting it. *United States v. Dakota,* 197 F.3d 821, 825 (6th Cir. 1999) (citing *In re Grand Jury Investigation* No. 83-2-35, 723 F.2d 447, 450 (6th Cir. 1983)).

"The attorney-client privilege protects from disclosure 'confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client.'" *In re Grand Jury Subpoena*, 886 F.2d 135, 137 (6th Cir. 1989) (quoting *In re Grand Jury Investigation*, 723 F.2d 447, 451 (6th Cir.1983)). The elements of common law attorney-client privilege are as follows: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998). Thus, the attorney-client privilege may apply even where an attorney-client relationship did not come into existence. *See Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir. 1978); *Banner v. City of Flint*, 99 Fed. Appx. 29, 36 (6th Cir. 2004).

The attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.

> "[T]he protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) (citation omitted). It is also clear that "when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged."

7

*Antoine v. Atlas Turner, Inc.,* 66 F.3d 105, 110 (6th Cir. 1995). Privilege also does not extend to the general nature of the legal services the attorney was retained to perform. *Nicholson v. Great Lakes Towing Co.,* No. 07-11134, 2008 WL 2949234, *2 (E.D. Mich. July 29, 2008). The Sixth Circuit has cautioned that "the scope of the privilege should not exceed what is necessary to effect the policy considerations underlying the privilege, namely, to encourage clients to make full disclosure to their attorneys." *In re Grand Jury Subpoena*, 886 F.2d at 137; *see Reed,* 134 F.3d at 356 (stating that "[i]t is appropriate to recognize a privilege 'only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principal of utilizing all rational means for ascertaining truth.'"); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) ( "the privilege applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice.").

In this case, the Trustee seeks to explore the validity and value of the potential claims included on Debtor's amended Schedule B. While Debtor apparently sought legal advice from Matuszak and Moore in their capacity as lawyers, the court is hard-pressed to find that any communications regarding the validity and value of the potential claims included on amended Schedule B were made in confidence or that recognizing such communications as privileged would achieve the underlying purpose of encouraging clients to make full disclosure to their attorneys. Debtor's potential claims are assets of the bankruptcy estate that may be pursued by the Trustee if of benefit to the estate. Debtor's discussion with Matuszak and Moore were for the purpose of gathering information relating to those assets, and, according to Debtor, primarily relating to the License Agreement and Recipes. Presumably, any information relayed by Debtor or received from Matuszak and Moore regarding the validity and value of the claims was for the purpose of disclosing additional assets that the Trustee may pursue. Given Debtor's duty to cooperate with the trustee in the administration of the bankruptcy estate, *see* Fed. R. Bankr. P. 4002(a)(4), and his testimony regarding the purpose of his communication with Matuszak and Moore, the court finds that such communications were not intended to be made in confidence. Debtor has not met his burden of establishing the applicability of the attorney-client privilege with Matuszak and Moore as to his amended Schedule B.

In any event, even if the attorney-client privilege applies to Debtor's communication regarding the validity and value of the potential claims, the court agrees with the Trustee that waiver by her of the privilege is appropriate. In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985), the United States Supreme Court held that a bankruptcy trustee may waive a corporation's attorney-client privilege, reasoning that the power to control corporate attorney-client privilege is passed from corporate

management to the trustee "because the trustee's functions are more closely analogous to those of management outside of bankruptcy than are the functions of the debtor's directors." *Id.* at 356. However, the Court expressly limited its holding to privilege held by a corporation, and not an individual's attorney-client privilege, which it stated could only pass to a trustee if under some other theory that the one embraced by the Court. *Id.* at 356-57.

As discussed in *French v. Miller (In re Miller)*, 247 B.R. 704 (Bankr. N.D. Ohio 2000) (J. Speer), with respect to whether a trustee can waive an individual's attorney-client privilege, the cases fall into three categories. At one end of the spectrum are those that hold, as a matter of law, the trustee succeeds to the attorney-client privilege of an individual debtor. *In re Smith,* 24 B.R. 3, 4 (Bankr. S.D. Fla. 1982). At the other end of the spectrum are those that hold an individual's privilege never passes to the trustee. *See, e.g., In re Tippy Togs of Miami, Inc.*, 237 B.R. 236, 239 (Bankr. S.D. Fla. 1999). A third approach, and the one adopted in *Miller*, is that an individual debtor's attorney-client privilege does transfer to the trustee and the trustee has the power to waive the privilege when, on balance, the trustee's duty to maximize the value of the debtor's estate and represent the interests of the estate outweigh the policies underlying the attorney-client privilege and the harm to the debtor upon a disclosure. *Miller*, 247 B.R. at 710-11; *Degirolamo v. Daily & Haskins (In re Wittmer)*, Adv. No. 11-6007, 2011 WL 6000799, *2 (Bankr. N.D. Ohio Nov. 30, 2011) (J. Kendig); *Moore v. Eason (In re Bazemore)*, 216 B.R. 1020, 1025 (Bankr. S.D. Ga. 1998); *Ramette v. Bame (In re Bame)*, 251 B.R. 367, 377 (Bankr. D. Minn. 2000). For the reasons discussed in *Miller*, this court concludes that the balancing approach is the proper approach in determining whether a trustee may waive an individual's attorney-client privilege.

Applying the balancing approach, the court finds that the Trustee is entitled to waive Debtor's attorney-client privilege with respect to discussions with Matuszak and Moore regarding the underlying basis, and thus the validity, and the value of the claims included on amended Schedule B, including Debtor's claims under the License Agreement and ownership of the Recipes. Disclosure of such discussions, as specifically limited, is unlikely to cause harm to Debtor. Specifically, disclosure of discussions regarding the validity and value of claims that Debtor, in fact, wants the Trustee to pursue, is not likely to reveal any basis for her to pursue revocation of Debtor's discharge.[4] By comparison, the sole purpose of the Trustee's inquiry is to augment her ability to administer the estate with respect to those assets and to potentially increase the value of Debtor's estate to his creditors, including M&M. The court finds that the Trustee's

---

[4]The court is aware that United States Trustee Daniel M. McDermott, as plaintiff, filed an adversary complaint against Debtor, as Defendant, on May 6, 2015, seeking revocation of his Chapter 7 discharge. Case No. 13-34137, Adv. Pro. No. 15-03041.

9

interests and the interests of the estate coincide with the underlying policy of encouraging clients to make full disclosure to their attorneys and outweighs any harm to Debtor, which is essentially nonexistent in light of the limited waiver sought.

## III. Work Product Doctrine

The Trustee also seeks to explore the legal theories that Matuszak and Moore believe support the claims listed in Debtor's amended Schedule B. An attorney's legal theories implicate the work product doctrine, which may be asserted by either the attorney or the client. The work product doctrine is distinct from the attorney-client privilege. It consists of "tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions. *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F.2d 933, 935 (6th Cir. 1980) (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). In *Hickman,* the Supreme Court recognized that an attorney's "proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman,* 329 U.S. at 511. The Supreme Court explained:

> In performing his various duties . . .it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Id.* The work product doctrine described in *Hickman* has been codified in Rule 26 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 26(b)(3); Fed. R. Bankr. P. 9014(c), 7026. The burden of establishing the applicability of work product protection to particular circumstances also rests with the person or entity asserting it. *Randleman v. Fid. Nat'l Title Ins. Co.,* Case No. 3:06CV7049, 2008 U.S. Dist. LEXIS 88905, * 6 (N.D. Ohio October 21, 2008)(J. Carr).

Thus, the Sixth Circuit has explained that the work product doctrine "preserve [s] the integrity of the adversarial process," *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir.2009) (citing *Hickman*, 329 U.S. at 510–14)), which is the "overriding purpose" of the doctrine, *Newhouse v. United States (In re Antitrust Grand Jury)*, 805 F.2d 155, 164 (6th Cir.1986). It protects neither lawyers nor clients but rather

"'the adversary trial process itself.'" *McKinstry v. Genser (In re Black Diamond Min. Co., LLC)*, 507 B.R. 209, 216 (E.D. Ky. 2014) (quoting *Moody v. I.R.S.*, 654 F.2d 795, 800 (D.C. Cir. 1981)).

Given such purpose, courts have found that the work-product doctrine only shields materials "sought by an adversary of the attorney's client." *McKinstry*, 507 B.R. at 216 (citing *Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir.1982)); *see In re Dayco Corp. Derivative Sec. Litig.*, 99 F.R.D. 616, 620 (S.D. Ohio 1983) (quoting *Koenig v. Int'l Sys. and Controls Corp. Sec. Litig. (In re Int'l Sys. and Controls Corp. Sec. Litig.)*, 693 F.2d 1235, 1239 (5th Cir. 1982) and stating that "The work product privilege is based on the existence of an adversarial relationship. . . ."));  *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 687 (W.D. Mich. 1996) (same). In addition, the doctrine applies only where the asserted work product was created "in anticipation of litigation," and where such anticipation was "objectively reasonable." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381 (6th Cir. 2009). Thus, in order to apply the work product doctrine, the court must find that (1) work product is being sought by an adversary of the attorney's client and (2) that it was created by the attorney in anticipation of litigation that is objectively reasonable.

In this case, the Trustee is not an adversary of Debtor with respect to the claims listed in his amended Schedule B. In fact, as noted above, Debtor wants the Trustee to pursue those claims. As one court stated, the work product doctrine "does not entitle an attorney to withhold from a client's trustee in bankruptcy work-product for the client's pre-petition lawsuits, so long as the trustee and the client are not adverse in those suits." *Foster*, 188 F.3d at 1272. Likewise, it does not entitle an attorney to withhold from a client's bankruptcy trustee work-product created for any potential lawsuit based upon prepetition conduct where the trustee and the client are not adverse, such as is the case here with respect to all claims included in amended Schedule B.

The court also finds that Matuszak and Moore's legal theories for claims not raised during their representation of Debtor in state court, namely, the potential claim against Fifth Third for violation of banking rules and regulations and the potential Legal Malpractice Claim, were not developed in anticipation of litigation by them on Debtor's behalf since, as discussed earlier, an attorney-client relationship never existed as to those claims and any litigation of those claims would be pursued by the Trustee. Similarly, to the extent that new legal theories have been developed by Matuszak and Moore that underlie the remaining claims, namely, claims against the Receiver and Waina and claims relating to the License Agreement and the Recipes, those theories were not developed with the reasonable anticipation of litigation by them since such claims are assets of the bankruptcy estate and as such would not be pursued by creditors

11

Matuszak or Moore.

For the above reasons, the court finds that the Debtor, Matuszak and Moore have not shown the court that the work product doctrine is implicated in this case with respect to Matuszak and Moore's theories and opinions as to Debtor's amended Schedule B claims.

## CONCLUSION

For the foregoing reasons, the court finds that (1) an attorney-client relationship between Debtor and Matuszak and Moore exists only with respect to issues raised in the state court proceedings but does not exist as to potential claims against Fifth Third for violation of banking and underwriting rules and regulations and the Legal Malpractice Claims; (2) the attorney-client privilege does not apply to Debtor's January 13, 2015, and post-January 13, 2015, discussions with Matuszak and Moore regarding the factual bases and value of potential claims included on amended Schedule B, and that even if such privilege applies, the Trustee is entitled to waive it; and (3) the work product doctrine is not implicated to the extent opinion work product of Matuszak and Moore is sought regarding claims Debtor included in amended Schedule B.

**THEREFORE,** for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the Trustee's Motion for Determination Regarding Alleged Attorney-Client Privilege Between Debtor and Petitioning Creditors [Doc. # 158] be, and hereby is, **GRANTED in part** and **DENIED in part** as set forth herein.

###