**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated:  March 10 2017**

Mary Ann Whipple
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | Case No. 13-34137 |
|  | ) |  |
| Robin L. Horvath, | ) | Chapter 7 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | JUDGE MARY ANN WHIPPLE |

## MEMORANDUM OF DECISION REGARDING FIRST AND FINAL APPLICATION OF ROETZEL & ANDRESS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

This case came before the court for hearing on the First and Final Application of Roetzel & Andress for Compensation and Reimbursement of Expenses ("Fee Application") [Doc. # 257] with respect to the firm's representation of the Chapter 7 Trustee and the objection to the Fee Application filed by Creditors Thomas A. Matuszak LLC, Ballenger & Moore Co. LPA, and Matuszak & Koder Ltd ("Objecting Creditors") [Doc. #261]. Counsel for Objecting Creditors and attorney Patricia Fugee ("Fugee") appeared at the hearing in person.[1] Counsel for the United States Trustee ("UST"), for Fifth Third Bank ("Fifth Third") and for Roetzel & Andress ("Roetzel") all appeared by telephone.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case

---

[1] On February 24, 2014, the court granted the Trustee's motion to employ Fugee and the attorneys and paralegals formerly associated with her at the law firm of Roetzel & Andress to represent the Trustee in this case. [Doc. # 39]. Due to a change in Fugee's professional association, on March 18, 2016, the Trustee filed a renewed motion to employ Fugee and the attorneys with whom she is now regularly associated at the firm of FisherBroyles, LLP. [Doc. # 235]. Objecting Creditors have also filed an objection to the pending motion to employ.

under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings involving fee applications of counsel for a trustee are core proceedings at the heart of administration of the bankruptcy estate that the court may hear and determine under 28 U.S.C. § 157(b)(1) and (b)(2)(A).

At the hearing, the parties agreed that an evidentiary hearing was not necessary for the court to address the objection and rule on the Fee Application given the extensive proceedings in this case and related adversary proceedings as well as the record submitted in support of the parties' respective positions, of which the court may take judicial notice, and given the court's close involvement in those proceedings over approximately the past three years.

The court took the Fee Application under advisement subject to the court's determination of the admissibility of a document proffered at the hearing by Objecting Creditors that Debtor had received from the United States Department of Justice after his request pursuant to the federal Freedom of Information Act and to which the UST objected. According to Objecting Creditors, the proffered document would support their argument that the Fee Application should be denied due to Applicant's conflict of interest and, specifically, that it would show that creditor Fifth Third received preferential treatment by Fugee while employed by the Chapter 7 Trustee ("Trustee"). The court granted any party in interest desiring to do so leave to file a memorandum in support of their position regarding the admissibility and relevance of the proffered documents. The UST, Roetzel and Fugee each timely filed a memorandum, arguing that the document containing certain email communications is not relevant to the issue before the court. No memorandum was filed by Objecting Creditors.

The proffered document contains email communications primarily between the Trustee and counsel for the UST. It contains only one email communication between Fugee and counsel for the UST and one email from Fugee to the Trustee. The court has reviewed the email communications and agrees that none of the emails have any relevance to the issue for which they were proffered with the exception of the April 21, 2016, email from the Trustee to Fugee containing a discussion of an opinion regarding conflict of interest. Only that email will be admitted as evidence in this matter. None of the other emails, only one of which even mentions Fifth Third, make Objecting Creditors' allegation that Fifth Third received preferential treatment by Fugee more or less probable than it would be without the evidence and are thus inadmissible. *See* Fed. R. Evid. 401; Fed. R. Bankr. P. 9017.

Having reviewed the entire record of proceedings in this case and the adversary proceedings filed

2

by the UST and by the Chapter 7 Trustee, as well as the record submitted in support of the parties' respective positions, the following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52 with respect to the Fee Application and the objection. For the reasons that follow, the court will approve the Fee Application as modified in this memorandum of decision.

## FACTUAL BACKGROUND

On October 7, 2013, Objecting Creditors commenced this case by filing an involuntary Chapter 7 petition against their client Debtor Robin Horvath ("Horvath") trying to collect professional fees he owes to them. For years before the case was commenced, Horvath had been, and still is, a party to state court litigation involving a number of cases and claims against a number of parties, all stemming from his fifty percent ownership of Tony Packo's Inc., Tony Packo Food Company, LLC, Packo Properties, LLC, and Magyar Holdings, LLC ("the Packo Companies"), disagreements amongst the owners of the Packo Companies, and his partial personal guaranty of the companies' debts owed to Fifth Third. The Packo Companies are now the subject of a receivership proceeding in the Lucas County, Ohio, Common Pleas Court ("State Court").

In previous opinions entered in this case and in the adversary proceeding commenced against Horvath and others by the Chapter 7 Trustee, the court has set forth in detail the various proceedings in state courts and issues raised in those proceedings. The court summarizes those proceedings below, all of which have created issues in proceedings in this case.

## I. 2002 State Court Litigation between Owners of TPI ("2002 Litigation")

In 2002, Horvath and his mother, Nancy Packo Horvath ("NPH"), who at that time together owned fifty percent of the shares of Tony Packo's Inc. ("TPI"), commenced an action in State Court against TPI and Anthony Packo, Jr. ("Packo, Jr.") and Anthony Packo III ("Packo III"), who together owned the remaining shares of TPI. The case was brought as both a shareholder derivative action seeking compensatory damages caused by an alleged breach of duty by those defendants and as a direct action seeking compensatory damages allegedly sustained by Horvath and NPH individually.

The complaint avers, among other things, that TPI was incorporated in 1968 as the successor-in-interest to Tony Packo's Café, a proprietorship started in 1932 by NPH's parents, Anthony Packo, Sr. ("Packo, Sr.") and Rose Packo. It also avers that, in 1962, Packo, Sr. "gave all of his food recipes for the sausage, pickles and peppers, and the sauce to Nancy Packo Horvath with instructions that she was to be the sole keeper of the recipes for the family business" and that Packo, Sr. died in 1963. Prior to the verified

complaint being filed, NPH executed an affidavit on June 10, 2002, ("NPH Affidavit"), stating that in July 1962 her father "wrote down all of his food recipes in a spiral bound notebook that were used for the entire menu. My father gave all the recipes to me with the instructions that I was to be the sole keeper and owner of his recipes and formulas." NPH had possession of the spiral bound notebook ("Recipe Notebook"); however, Horvath has had possession of it since removing it from NPH's home shortly before her death in April 2003.

The 2002 Litigation was dismissed on November 5, 2002, pursuant to a settlement. The parties entered into a Term Sheet that set forth the settlement and that addressed, among other things, NPH's claim of ownership of recipes and intellectual property used in the operation of the business. Pursuant to the Term Sheet, on October 31, 2002, TPI, as licensee, and NPH, as licensor, entered into a License Agreement, which was signed by NPH, individually, and by Packo, Jr. and Horvath, as officers of TPI. [Adv. Case No. 15-3058, Doc. # 1, ¶ 21 and attached Ex. D and ¶ 21 of Doc. ## 42, 43, 45, & 76]. The License Agreement states that NPH "claims ownership" of certain intellectual property and recipes used by TPI. [*Id.,* Doc. # 1, Ex. D, Recitals & ¶ 3.1.4]. It defines "Recipes" to mean "the recipes to the chili soup and hot dog sauce used by [TPI] in its restaurant, catering, and wholesale foods businesses" and grants to TPI an "irrevocable, perpetual, exclusive, royalty-free, right and license, with unrestricted rights to sub-license, to use the Recipes and all Improvements or derivations therefrom in the [entire world]." [*Id.* at ¶¶ 1.8, 1.9, & 2].

## II. State Court Receivership Proceeding

On August 18, 2010, Fifth Third obtained a cognovit judgment in the State Court in the total amount of approximately $2,676,296, plus interest, costs and attorney fees, against the Packo Companies and a cognovit judgment in the amount of approximately $669,000, plus costs and attorney fees, against Horvath and Packo, Jr. based on their respective partial personal guaranties of the corporate debt. Thereafter, the State Court appointed a receiver for all of the real and personal property of the Packo Companies ("Receivership Entities"). The Receiver was authorized to negotiate and effect an orderly sale or transfer of all or any portion of the assets.

On October 7, 2011, the State Court issued an order directing the receiver to accept the offer submitted by TP Foods nka Tony Packo's Toledo, LLC, to purchase assets of the Receivership Entities. Horvath appealed that order but did not seek a stay of the receivership proceedings. The appeal was dismissed on January 5, 2012, for lack of a final appealable order.

Notwithstanding Horvath's appeal of the October 7 order, the receivership proceedings continued. On December 7, 2011, the State Court entered an order determining ownership of recipes for products sold

4

by the Receivership Entities and intellectual property used in the operation of those entities ("Recipe Order"). [Doc. # 96, Ex. S]. The State Court found that the recipes, including the recipes for chili soup and hot dog sauce, were exclusive assets of the Receivership Entities and thus were assets of the receivership. [*Id.* at 2]. The order grants the Receiver the "sole, exclusive and unrestricted right to sell and transfer. . . all Recipes." [*Id.* at 3]. The State Court also found that all trade names and intellectual property used in the operations of the Receivership Entities are assets of the receivership that may be sold by the Receiver. [*Id.*].

On December 19, 2011, the State Court entered an order authorizing the Receiver to execute the Asset Purchase Agreement ("APA") negotiated with TP Foods. On December 22, 2011, the State Court entered an order confirming the sale of the receivership assets. Horvath timely appealed the December 19 and 22 orders. Horvath again did not seek a stay of the receivership proceedings and, after a hearing held by the State Court, the sale of receivership assets to TP Foods, LLC, closed on February 3, 2012.

On January 11, 2013, the Ohio Sixth District Court of Appeals entered a decision finding that the trial court lacked jurisdiction to enter the December 19 and 22 orders because the appeal of the October 7 order was pending at the time the orders were entered. *Horvath v. Packo*, 985 N.E.2d 966, 986 (2013). On remand, the court of appeals directed the trial court to determine whether to confirm or set aside the asset sale since the appeal of the October 7 order was then no longer pending. *Id.* On May 6, 2013, the State Court entered an order confirming the sale ("Sale Confirmation Order"). Horvath, his wife Terrie Horvath, and Nancy Packo, LLC,[2] filed a timely appeal of that order. Although that appeal has been dismissed with respect to Terrie Horvath and Nancy Packo LLC, it remains pending as to Horvath but has been stayed by the Ohio Sixth District Court of Appeals pending completion of his bankruptcy proceeding or relief from stay being granted by this court. *See Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736 (6th Cir. 1980) ("Federal courts may take judicial notice of proceedings in other courts of record"); *cf. Buck v. Thomas M. Cooley Law School*, 597 F.3d 812, 816 (6th Cir. 2010) (stating that a court may take judicial notice of other court proceedings without converting a motion to dismiss into one for summary judgment). Throughout the receivership proceedings and appeals in those proceedings, Horvath was represented by the two Objecting Creditors that are law firms. The law firm Objecting Creditors, however, have moved to withdraw from their representation with respect to the appeal of the Sale Confirmation Order.

The APA provides that, in the event an appeal of the order confirming the sale was filed, as was the

---

[2] Nancy Packo, LLC, of which Horvath and his wife are the only members, had submitted an offer to purchase the receivership assets. That offer was not accepted.

5

case at the time of closing, the purchase price of $5.5 million, less certain specified amounts, would be paid by TP Foods' delivery of a promissory note rather than a cash payment. Pursuant to the APA, the principal balance on the note would not be due until, in TP Foods' reasonable judgment, all appeals have been resolved in a manner that eliminates the possibility that the transactions contemplated therein can be unwound or adversely affected and no other court action is threatened or pending that could have such an effect. The APA provides that, at such time, $115,000 of the principal balance is to be paid directly to Horvath as payment of deferred salary earned by him during the receivership and as payment of a pre-receivership loan by him to the Receivership Entities. At the February 3, 2012, closing, TP Foods executed the required promissory note in favor of the Receiver.

### III. Horvath's Whistleblower Case

Before Fifth Third's cognovit judgment was entered and the receivership was commenced, Horvath, along with three other employees of the Packo Companies, provided information to the Lucas County Prosecutor regarding alleged misappropriation of funds by Packo III, vice-president of Tony Packo Food Company, LLC, and Cathleen Dooley ("Dooley"), Controller of TPI. The information provided ultimately resulted in the indictment of Packo III and Dooley, both of whom were later acquitted.

In June 2012, Horvath filed a complaint against a number of defendants, including the Receiver, its managing member Steve Skutch and consultant Gregory Waina in both their professional and individual capacities, TP Foods, Bennett Management Corp., Packo III, and Packo, Jr. The complaint alleges that Horvath's employment at TPI was terminated in retaliation for his whistleblowing activity in violation of the Ohio Whistleblower Act and public policy.

### IV. Horvath's "Interference" Claims

On February 15, 2013, Horvath filed a fifty-four count complaint in state court, naming Packo, Jr., and Packo III as defendants. Horvath alleges, among other things, certain conduct of the defendants constitutes tortious interference with business and contractual relationships between and/or involving Horvath and Fifth Third. Although Fifth Third is not named as a defendant, Horvath alleges in the complaint that Fifth Third conspired with the defendants to tortiously interfere with those contractual relationships and that Fifth Third acted maliciously and in bad faith with the specific intent of harming him. In the judgment lien foreclosure action discussed below, Horvath filed on October 19, 2011, a motion for leave to file a counterclaim against Fifth Third that alleges that Fifth Third conspired with the Packos to tortiously interfere with those business and contractual relationships. Notwithstanding those allegations, Horvath did not include such a claim against Fifth Third as an asset in his bankruptcy schedules.

6

## V. Fifth Third's Foreclosure Suit

After obtaining the cognovit judgment against Horvath, Fifth Third obtained a judgment lien against real property owned by him. [*See* Trustee's Ex. E & attached Ex. B]. On May 13, 2011, Fifth Third commenced a foreclosure action in State Court relating to property located at 1925 Consaul Street, Toledo, Ohio ("Consaul Property").

## VI. Horvath's Involuntary Bankruptcy Case

Objecting Creditors, Horvath's prepetition lawyers and accountant, were the Petitioning Creditors that filed this involuntary petition on October 7, 2013. Horvath did not answer or otherwise contest the petition, and an Order for Relief was entered on December 23, 2013. Shortly thereafter, a motion for relief from stay was filed by the State Court Receiver, seeking relief in order to proceed in Horvath's appeal of the Sale Confirmation Order in the Ohio Sixth District Court of Appeals. The Trustee opposed that motion. Although an evidentiary hearing on the Receiver's motion for relief from stay was scheduled, at the Receiver's request, it did not go forward in order to allow him to discuss with the Trustee a potential settlement of issues involved in the State Court receivership.

On February 7, 2014, the Trustee filed a motion to employ Fugee and the lawyers with whom she was regularly associated at the law firm of Roetzel & Andress to assist her in evaluating assets of the estate ("Motion to Employ"). The Motion to Employ states that the charges to be made will be based upon the rates in effect at the time services are rendered and that Fugee's current rate, which was subject to future increases, was $340/hour. The Motion to Employ included Fugee's affidavit wherein she discloses that Fifth Third had been, and is, a client of Roetzel in unrelated matters and that in the event the Trustee has any basis to seek relief against Fifth Third, she will need to procure special counsel but that she was not aware of any basis to do so at that time. [Doc. # 32]. No objections were filed, and the court granted the motion, effective February 7, 2014. [Doc. # 39].

On April 19, 2016, in connection with the objection to Roetzel's Fee Application filed by Objecting Creditors and the Trustee's recent motion to employ Fugee and the attorneys with whom she is now regularly associated at the law firm of FisherBroyles, LLP, Fugee filed a supplemental affidavit. [Doc. # 251]. She states that receipts from unrelated Fifth Third matters constituted well under one percent of FisherBroyles' annual revenues for each of 2014 and 2015 and that Roetzel's records for the same period reflect that receipts from Fifth Third in unrelated matters were similarly small relative to its annual revenues. [*Id.* at ¶¶ 4-5]. She further states that she personally did very little work for Fifth Third, billing 4.5 hours

in 2014 and 0.5 hours in 2015 for work in unrelated matters and billing no hours in 2016 for work on Fifth Third matters. [*Id.* at ¶ 3].

After filing a motion to vacate the order for relief on the involuntary petition and later withdrawing that motion, Horvath filed his original bankruptcy schedules on February 28, 2014. He scheduled as assets his fifty percent ownership interests in the Packo Companies, his interest in the appeal of the Sale Confirmation Order and the "Tony Packo's Recipe 'Ingredient' List," but did not schedule the Tony Packo recipes. [Doc. # 43, pp. 2-3]. At the March 10, 2014, meeting of creditors, Horvath testified that the recipes were sold but that the ingredient list is separate from the recipes. [Doc. # 94, Ex. B., p. 14-15]. He further testified that in his appeal of the Sale Confirmation Order, he is not challenging the sale of assets to TP Foods based on the sale of the recipes. [*Id.* at 16-18].

Horvath's originally filed bankruptcy schedules also show assets that include the Consaul Property, [Doc. # 42], $55,000 owed to him by TP Foods, $60,000 owed to him for "back wages," his interests in the Whistleblower case, and a "potential" legal malpractice lawsuit against Troy L. Moore and Thomas A. Matuszak, the principals of the law firm Objecting Creditors, [Doc. # 43]. Horvath's interference suit was not included as an asset nor were any claims against Fifth Third. Horvath testified at his meeting of creditors that he did not have a claim against Fifth Third and later that he did not know if he has a claim against Fifth Third.

Timely proofs of claim were filed in the total amount of $1,739,983.13, including seven proofs of claim filed as general unsecured claims by Fifth Third in the total amount of approximately $782,125, plus attorney fees in an amount to be determined, proofs of claim filed as general unsecured claims by Objecting Creditors in the total approximate amount of $821,850, and a priority tax claim filed by the State of Ohio of approximately $86,704. Although filed after the claims bar date, Terrie Horvath filed a proof of claim with no dollar amount but indicating as a basis for her claim that she has an interest in assets of the bankruptcy estate. In her objection to, and at the hearing on, the motion to approve compromise discussed below, she clarified that she claims an interest in the $60,000 owed to Horvath as deferred compensation earned during the receivership, which she characterized as a marital asset in their pending divorce action.

The Trustee filed a motion to approve a compromise with respect to the majority of the state court litigation. Objections to approval of the proposed compromise were filed by Horvath and Objecting Creditors, as well as Horvath's wife. On January 13, 2015, the court held an evidentiary hearing on the motion. In theory, the compromise was intended to resolve litigation and claims affecting the transactions contemplated in the APA and cause TP Foods' promissory note to become due and payable. In doing so,

8

TP Foods would then be required, as provided in the APA, to pay to the Trustee the $55,000 owed to Horvath as repayment of a loan obligation and the $60,000 of deferred compensation owed to Horvath. To that end, the compromise required the Trustee to dismiss Horvath's appeal from the Sale Confirmation Order and to relinquish any claim to assets included in the receivership, including recipes and lists of ingredients. The Trustee retained any right to a distribution from the receivership based upon Horvath's ownership interests in the Packo Companies in the event that there is such a distribution after receivership creditors are paid. In addition, Fifth Third would release its lien on the Consaul Property, and the estate would also receive a total of $26,000 in exchange for Horvath's release of all claims against Fifth Third and claims against TP Foods and Bennett Management Corp. in the Whistleblower case.

Objecting Creditors contested the Trustee's assessment of the value of prevailing in the appeal of the Sale Confirmation Order, arguing that one of the issues in the appeal is whether the Tony Packo recipes defined in the License Agreement were receivership assets properly sold to TP Foods. Objecting Creditors argued that the bankruptcy estate, not the receivership estate, is entitled to the value of those assets.

On March 3, 2015, the court denied the Trustee's motion to approve compromise, although for reasons other than those raised in the objections. The court found, among other things, that the Trustee's assessment that the only remedy in the event she would prevail in the appeal of the Sale Confirmation Order would be the unwinding of the sale of receivership assets was a reasonable one. [Doc. # 126, p. 17]. And while the court found that the complexity and expense of the litigation, especially in light of the fact that the Trustee testified that she has no funds to pursue the appeal, weighed in favor of approval of the proposed compromise, the court denied the motion without prejudice because of certain ambiguities and internal inconsistencies that the court found made it susceptible to continued, and perhaps protracted, litigation as to its meaning and implementation. [*Id.* at 19-20].

On February 10, 2015, after the evidentiary hearing on the Trustee's motion to approve compromise, Horvath filed an amended Schedule B, adding "assets from the Estate of Nancy Packo Horvath, including, but not limited to, the License Agreement dated October 29, 2002, between Nancy Packo Horvath & Tony Packo's Inc. and any rights arising from that agreement." [Doc. # 119, Amended Schedule B, p. 4]. Horvath's amended Schedule B also added "potential" claims against the law firm of Robison, Curphey & O'Connell and two of its attorneys for "failure to protect Tony Packo's Inc.'s (and related entities) Assets" and against "Receiver Steven Skutch and/or the Skutch Companies, Limited," and Gregory Waina "CPA and Consultant for Steven Skutch." [Doc. # 119, pp. 4-5]. In addition, a "potential" claim against Fifth Third for "violation of various banking and underwriting rules and regulations" is included in amended

Schedule B. The Trustee has consulted separate counsel regarding that potential claim, and Fugee was not a participant in that consultation. [Doc. # 251, ¶ 7].

In light of the amended Schedule B and the newly disclosed assets, including Horvath's abrupt change in position regarding ownership of the recipes, the Trustee requested and the court ordered a Bankruptcy Rule 2004 examination of Horvath. The court also granted Fifth Third's motion to allow it, as a creditor and party-in-interest, to inquire of Horvath at the Rule 2004 examination. At the Rule 2004 examination, Horvath testified regarding facts that he believes support his "potential" claims included on his amended Schedule B. He also testified that reference to his interest in the Nancy Packo Horvath Estate ("NPH Estate") and the License Agreement on amended Schedule B refer to the Tony Packo's hot dog sauce and chili soup recipes and that the recipes are either owned by him or the Nancy Packo Horvath Trust ("NPH Trust"). [Doc. # 168, pp. 66, 104].

Three days before commencement of his Rule 2004 examination, on April 27, 2015, Horvath filed in the Probate Court of Lucas County, Ohio ("Probate Court") an application for authority to administer the NPH Estate.[3] [Doc. # 195, Ex. 7]. Notwithstanding his pending bankruptcy proceeding and his amended Schedule B, on May 1, 2015, Horvath, as executor, filed an Inventory and Appraisal and Schedule of Assets in the Probate Court, describing the following as the only assets of the probate estate:

> INTANGIBLE PERSONAL PROPERTY
> Pursuant to (without limitation) the September 10, 2002 Term Sheet, the RECIPES (including, but not limited to the chili soup and hot dog sauce used by Tony Packo's, Inc. in it restaurant, catering and wholesale food businesses, and all "improvements or derivations therefrom" per the October 31, 2002 License Agreement) and all other INTELLECTUAL PROPERTY used in the operation of Tony Packo's, Inc.'s business, and all of the RECIPES AND FORMULAS referenced in the June 10, 2002 Affidavit of Nancy Packo Horvath.

[Adv. No. 15-3058, Doc. # 1, ¶ 66 and attached Ex. P; ¶ 66 of Doc. ## 42,43,45, & 76]. Without seeking authority of this court, on May 4, 2015, Horvath signed a document as executor of the NPH Estate that purports to transfer "for value received" the Tony Packo recipes, formulas and other intellectual property to Horvath, as trustee of the NPH Trust. [*Id.* at ¶ 67 and attached Ex. Q; ¶ 67 of Doc. ## 42, 43, 45, & 76].

On May 5, 2015, the UST filed an adversary complaint seeking an order revoking Horvath's discharge entered in this case, alleging that he failed to obey the court's order to produce certain documents at his Rule 2004 examination and intentionally omitted assets from his original schedules. [Adv. No. 15-

---

[3] In 2003, after NPH's death, Horvath had applied for and was granted a summary release of NPH's estate from administration in the Probate Court. [Adv. No. 15-3058, Doc. # 141, Ex. A].

3041].

On June 9, 2015, the Trustee commenced an adversary proceeding seeking a declaration regarding ownership of the recipes included by Horvath as assets of the NPH Estate and as assets on his amended Schedule B. [Adv. No. 15-3058]. The Trustee's complaint also sought turnover of the recipes and an order enjoining Horvath from transferring, encumbering or taking any other action with respect to the recipes. All parties asserting an interest in the recipes were made parties defendant, including Horvath, the NPH Estate, the NPH Trust, and TP Foods. Cross motions for summary judgment were filed by all of the parties, raising numerous issues, including, among other things, the preclusive effect of the State Court's Recipe Order, the legal significance of the Term Sheet and License Agreement, and the nature of the NPH Trust. In ruling on the motions, the court found that the ownership claims of Horvath, the NPH Estate and the NPH Trust, as well as the ownership claim of the Trustee, were barred by the res judicata effect of the Recipe Order and Sale Confirmation Order. The court further found that the Trustee had met her burden of showing that the requested injunctive relief was warranted with respect to recipes for Tony Packo chili soup and hot dog sauce, which Objecting Creditors have described as extremely valuable assets worth millions of dollars and are the primary focus of the recipe ownership battle in this court.

On May 5, 2016, Roetzel filed its first and final application for compensation and reimbursement of expenses. The law firm requests fees in the amount of $216,373.50 for services rendered and $4,384.38 in expenses.

Additional facts to the extent relevant are discussed in the court's analysis below.

## LAW AND ANALYSIS

The Bankruptcy Code authorizes a trustee, with court approval, to employ an attorney to represent or assist the trustee in carrying out the trustee's duties. 11 U.S.C. § 327(a). Under § 330(a), the court may award counsel employed by a trustee "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A) & (B). The fee applicant has the burden of establishing that the fees requested are reasonable. *Brooks v. Invista (Koch Indus.)*, 528 F. Supp. 2d 785, 788 (E.D. Tenn. 2007) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999)).

In their objection, Objecting Creditors raise four grounds for denying the Fee Application: (1) the entries in the Fee Application are not sufficiently particularized; (2) the Fee Application seeks fees and expenses for work that should have been performed by the Trustee; (3) the fees and expenses are not reasonable and were not beneficial to the bankruptcy estate; and (4) a conflict of interest of Roetzel requires

11

denial of the Fee Application in its entirety. The court discusses each objection below.

## I. Sufficiently Particularized Entries

A useful starting point for determining the amount of a reasonable fee is employing a lodestar analysis. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008). A lodestar analysis requires the court to determine the number of hours reasonably expended on a case multiplied by a reasonable hourly rate. *Id.* A key requirement in this analysis is that "the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Id.* at 553. Where documentation is inadequate, the court may reduce an award accordingly. *Hensley*, 461 U.S. at 433.

In *Imwalle*, the Sixth Circuit Court of Appeals addressed the sufficiency of billing descriptions relating to a request for an award of attorney fees by the plaintiff's counsel. Counsel had submitted fifty-two pages of itemized billing records "that specif[ied], for each entry, the date that the time was billed, the individual who billed the time, the fractional hours billed (in tenths of an hour), and the specific task completed." *Id.* at 553. In addition, each page of the billing record included a heading identifying the client matter number and client matter description. *Id.* at 553-54. The court noted that, although some of the time entries provided "only the briefest description of the task completed, . . . explicitly detailed descriptions are not required." *Id.* at 554. The court concluded that the billing entries, "when read in the context of the billing statement as a whole and in conjunction with the timeline of the litigation" supported the district court's determination that the hours charged were actually and reasonably expended in prosecution of the litigation. *Id.*

In this case, Objecting Creditors argue that the entries in the Fee Application are not sufficiently particularized. Although they direct the court to no particular entry that they believe is insufficient, they argue that entries concerning telephone calls, meetings, and correspondence involving Fifth Third, TP Foods, the Receiver and counsel for Packo, Jr. and Packo III do not indicate the subject matters involved. However, the court has carefully reviewed the Fee Application and found no entries concerning telephone calls, meetings and correspondence with any party that do not indicate the general subject matter involved. As *Imwalle* instructs, more detailed descriptions are simply not required.

The Fee Application sets forth sixty-eight pages of detailed billing records that specify for each entry the fractional hours billed, the individual who billed the time, the task completed and the general subject matter of the task. The Fee Application indicates that time records were made contemporaneously with the

rendition of the services billed and were prepared by the person who had rendered the service. The entries in the billing record correlate with the time line and issues involved in the extensive litigation in, and administration of, this case. The court finds that the billing entries are sufficiently particularized for the court to determine with "a high degree of certainty" that the hours charged were actually expended and to allow the court to determine which hours were reasonably expended in this case. *See id.* at 553.

## II. Services That Are Properly Trustee Services

Objecting Creditors argue that hours billed for work that should have been performed by the Trustee are not compensable. The court agrees with this general legal principle. Because the Bankruptcy Code establishes separate frameworks for compensation to trustees and their counsel based on their distinct expertise and function in a bankruptcy case, issues arise in distinguishing services that are properly trustee services compensated within a flat rate and those that are properly counsel services often compensated at an hourly rate, as in this case. The following is a "widely accepted generalization" in distinguishing between compensable legal services and a trustee's duties:

> In general, professional time is limited to those tasks performed while representing the trustee in the prosecution of contested matters and adversary proceedings, attendance at court hearings in the capacity of attorney or other professional when the trustee has an interest, the preparation of professional related applications, and the performance of other specialized services that cannot be performed practically or lawfully by the trustee without engaging the services of a professional.

*In re Virissimo*, 354 B.R. 284, 290 (Bankr. D. Nev. 2006) (quoting *In re Holub*, 129 B.R. 293, 296 (Bankr. M.D. Fla. 1991)); *see In re McLean Wine Co., Inc.*, 463 B.R. 838, 848 (Bankr. E.D. Mich. 2011); *In re Lowery*, 215 B.R. 140, 142 (N.D. Ohio 1997); *In re Dorn*, 167 B.R. 860, 868 (Bankr. S.D. Ohio 1994). Simply put, "[t]he role of counsel for the trustee . . . is to perform those tasks that require special expertise beyond that expected of an ordinary trustee." *In re Virissimo*, 354 B.R. at 290 (citing *In re Garcia*, 335 B.R. 717, 725 (B.A.P. 9th Cir. 2005)).

Objecting Creditors direct the court to no particular entry that they believe shows that the Fee Application seeks fees and expenses for work that should have been performed by the Trustee. Nevertheless, notwithstanding the fact that, from the time it was commenced, this case has involved a multitude of complex legal issues relating to the administration of the bankruptcy estate, applying the above standards and after review of the Fee Application, the court finds that the following are services that are part of the Trustee's normal duties for which counsel may not be compensated. Fugee spent .30 hours requesting originals of newly-disclosed publicly-traded stock and locating a broker to sell Horvath's stock, for a total charge of $109.50. [Doc. # 257, pp. 10-11]. She also spent 1.2 hours preparing reports for the UST and .4

13

hours reviewing UST guidelines regarding reporting obligations of Chapter 7 trustees, for a total charge of $584.00. [*Id.* at 29-30]. Fugee also spent 1.3 hours reviewing and revising the UST's complaint brought against Horvath under 11 U.S.C. § 727 to assist with background facts, for a total charge of $474.50. [*Id.* at 47]. These fees, which total $1,168.00, will be disallowed.

## III. Hours Reasonably Expended

Objecting Creditors also argue that the fees and expenses are not reasonable and beneficial to the estate. For the fees and expenses requested to have been reasonably expended, "at a minimum, the attorney's time must relate to a service that is reasonably likely to benefit the estate *or* necessary to the administration of the bankruptcy case." *Boyd v. Engman*, 404 B.R. 467, 477 (W.D. Mich. 2009) (emphasis added) (citing 11 U.S.C. § 330(a)(4)(A)(ii)); *see Kemp, Klein, Umphrey, Endelman and May v. Veltri Metal Prod., Inc. (In re Veltri Metal Prod., Inc.)*, 189 Fed. Appx. 385 (6th Cir. 2006).

When considering benefit to the estate, "the pertinent question is not whether the services performed by the professional conferred an actual benefit upon the estate; but whether, when viewed under the circumstances in existence at the time, the services were reasonably calculated to benefit the estate." *In re Kennedy Mfg.*, 331 B.R. 744, 748 (Bankr. N.D. Ohio 2005). In addition, "[s]ervices may be 'necessary to the administration of the case' without financially benefitting the estate." *Veltri Metal Prod., Inc.*, 385 Fed. Appx. at 389 (citing *Van Cott, Bagley, Cornwall & McCarthy v. B.R. & F., L.C. (In re Ricci Inv. Co., Inc.)*, 217 B.R. 901, 906-07 (D. Utah 1998) (reversing the bankruptcy court's denial of fees incurred where the applicants' actions did not benefit the estate but the fees were "unavoidably incurred")); *In re Thrifty Oil Co.*, 205 B.R. 1009, 1019 (Bankr. S.D. Cal. 1997) ("Services of the type rendered by [the creditors' committee's accountant] were not undertaken with an expectation of monetary benefit. Rather, they were rendered in furtherance of the [official creditors' committee's] duties under 11 U.S.C. § 1103(c)(2) and (3).").

Objecting Creditors' argument regarding the reasonableness of the compensation requested focuses on the fees and expenses associated with the motion to approve compromise and on hours spent in connection with the adversary proceeding filed by the Trustee, which seeks a declaration regarding ownership of the Tony Packo recipes at issue in this case and an order enjoining Horvath from further action relating to those recipes.

The court first addresses the hours billed in connection with the proposed global settlement of most of the issues in the multiple State Court proceedings and the motion to approve compromise. Objecting Creditors argue that the Trustee and her counsel did not ask to review the Recipe Notebook that Horvath

14

had with him at the March 10, 2014, meeting of creditors and then proceeded to negotiate a proposed settlement that the court did not approve and that would have required the Trustee to release any claim that Horvath has to those recipes or ingredients "without any corresponding consideration being paid to the Bankruptcy Estate." [Doc. # 261, p. 3].

The court finds, however, that the billed services relating to the proposed compromise were not only reasonably calculated to benefit the estate but also necessary to the administration of the case. During the relevant time period, Horvath had scheduled as an asset of his estate only Tony Packo's Recipe 'Ingredient' List; he did not schedule the Tony Packo recipes. At the meeting of creditors referred to by Objecting Creditors, Horvath testified that the recipes were sold in the receivership proceeding but that the ingredient list was separate from the recipes. With respect to releasing any claim to the Tony Packo's recipe ingredient list, the Trustee explained at the hearing on the motion to approve compromise that, in light of Horvath's testimony and the State Court's determination in the Recipe Order that the Tony Packo recipes were assets of the receivership, she placed no independent value for the bankruptcy estate on the recipe ingredient list, the value thereof being part of the consideration for sale of the receivership assets. Although none of the papers filed in Horvath's appeal of the Sale Confirmation Order in the Ohio Sixth District Court of Appeals indicate that the Recipe Order is even a subject of the appeal, the Trustee explained that, in any event, she had no money to fund and pursue the appeal.

While it is true that the court ultimately denied the motion to approve compromise, it found the Trustee's assessment of the value of the various state court claims and proceedings to be reasonable and that the complexity and expense of the litigation, especially given the lack of funds to pursue the appeal, weighed in favor of approval of the proposed compromise. [*See* Doc. 126, pp. 14-17]. The motion was nevertheless denied due to certain ambiguities and inconsistencies in the settlement agreement that the court believed (looking back with a hint of irony) would make it susceptible to continued litigation as to its meaning and implementation and, for that reason, was not in the best interests of creditors and the estate. Had those ambiguities been clarified and the inconsistencies been addressed, the compromise would have resulted in $141,000 being paid to the estate, Fifth Third releasing its judgment lien on real estate owned by Horvath, and, as agreed to at the evidentiary hearing, the withdrawal of Fifth Third's proofs of claim filed in this case. While the Trustee's efforts in settling the state court litigation were unsuccessful, the services rendered with respect thereto were reasonably calculated to benefit the estate at the time they were rendered. The services were also necessary to the administration of the case, especially given the Trustee's lack of funds to pursue any of the state court litigation and her reasonable assessment of the value of Horvath's

15

then-disclosed claims and potential claims against various parties in the state court proceedings. *Boyd*, 404 B.R. at 479 ("Settlement benefits the bankruptcy system as a whole, and each individual estate drawing on the value of that system, by 'allowing the trustee and creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims,'" (quoting *In re Fishell*, 47 F.3d 1168, 1995 WL 66622, *2 (6th Cir. 1995) (Table)).

After the evidentiary hearing on the motion to approve compromise was held, Horvath suddenly amended his Schedule B to include for the first time an interest in the assets of the NPH Estate, including the License Agreement relating to the Tony Packo hot dog sauce and chili soup recipes and which, according to the Inventory and the Schedule of Assets filed by him in Probate Court, also includes all of the recipes and intellectual property used in the operation of TPI's business. Shortly thereafter Horvath executed a document as executor of the NPH Estate that purports to transfer the recipes and other intellectual property to himself, as trustee of the NPH Trust. These developments, together with assertions by both Horvath and Objecting Creditors in court proceedings that the Tony Packo recipes at issue are worth millions, necessitated additional fact finding and raised a multitude of new legal issues to be addressed. Those issues included, among other things, an interpretation of NPH's last will and testament, the NPH Trust, the Term Sheet and License Agreement and the interplay of those documents, if any, with the State Court's Recipe Order, the trade secret status of the recipes, the effect of the Probate Court's order approving the Inventory filed by Horvath in that court, and Horvath's and the bankruptcy estate's interest in the assets of the NPH Estate and Trust, all of which required the assistance of counsel for the Trustee.

In light of these developments and the then multiple claims to ownership of the Tony Packo recipes, simply addressing the ambiguities and inconsistencies in the proposed settlement that were the basis for the court denying the motion to approve compromise was no longer an option. Rather, a determination as to such ownership became necessary in order to administer the assets included in Horvath's fluid bankruptcy schedules, which include not only any rights Horvath might have in the NPH Estate, and according to Horvath included certain Tony Packos recipes, but also the $115,000 that is to be paid to Horvath by TP Foods as payment of his deferred salary and a pre-receivership loan made by him, which amount is not due until no court action is threatened or pending that could cause the APA to be unwound or adversely affected. As the recipe ownership issue in this bankruptcy proceeding and the Probate Court proceeding would adversely affect the APA, an adversary proceeding naming all of the parties claiming such ownership rights (*i.e.* Horvath, the NPH Estate, the NPH Trust, and TP Foods) was inevitably necessary to obtain a declaratory judgment as to those rights, especially given the asserted value of the recipes. The adversary

16

proceeding was also necessary to obtain an order enjoining Horvath, individually or as executor of the NPH Estate or trustee of the NPH Trust, from taking further action to transfer or encumber the recipes at issue in the complaint pending the court's determination of ownership.

Nevertheless, Objecting Creditors contest in general the hours billed in connection with pursuit of that adversary proceeding, arguing that such efforts were undertaken to convince this court that the recipes should be deemed the property of non-creditor TP Foods. It is true that Fugee's legal analysis led to the conclusion that the Recipe Order was a final order and had claim or issue preclusive effect as to ownership of the recipes and that the bankruptcy estate's interest was limited to its interest in the appeal of the Sale Confirmation Order, a conclusion also reached by this court in ruling on the parties' motions for summary judgment in the adversary proceeding. While Objecting Creditors may disagree with that legal conclusion, the filing of the adversary proceeding was nevertheless unavoidable given the multiple claims of ownership involved, including Horvath's changing positions as to his interest in the recipes. A ruling regarding ownership of the recipes was necessary in order for the Trustee to move forward with administration of the bankruptcy estate.

Having carefully reviewed the Fee Application and being very familiar with the litigation in this case and the efforts required in addressing the multitude of issues that have arisen, for all of the foregoing reasons, except for the hours billed for services that are properly Trustee services as discussed above, the court finds the hours and expenses billed have been reasonably expended in that they were either reasonably calculated to benefit the estate given the circumstances in existence at the time the services were rendered or were necessary to the Trustee's administration of the bankruptcy estate.

## IV. Hourly Rates

No party has objected to the hourly rates sought in the Fee Application and, except as set forth below, the court finds that the hourly rates of $340 and $365 for attorneys Fugee, Schrader and Ketler to be reasonable and consistent with the rates set forth in the Trustee's Motion to Employ that was granted by the court. Hourly rates of $160 and $100 for work of paralegals and law clerks, respectively, are also reasonable.

However, the court will reduce the hourly rate of attorney Haupt from $435 to $365, as the Fee Application set forth no basis for charging a rate in excess of that which the court approved in granting the Motion to Employ. As attorney Haupt's services total 7.3 hours, Roetzel's requested fees will be reduced by $511 [($435 - $365) x 7.3].

17

## V. Conflict of Interest

Objecting Creditors argue that Roetzel's Fee Application should be denied due to its conflict of interest in representing the Trustee arising from Fugee's and the firm's representation of Fifth Third in matters unrelated to Horvath and the Packo Companies. Their argument requires the court to address the Bankruptcy Code's standards for employment of lawyers (and other professionals) by trustees set forth in § 327. 11 U.S.C. § 327. A valid professional appointment under § 327 is a prerequisite under § 330(a) to an award of professional compensation. *In re Federated Dept. Stores, Inc.*, 44 F.3d 1310, 1320 (6th Cir. 1995). Even where, as here, the professional's employment was previously approved by the court, § 330(a) mandates that, before awarding compensation, the bankruptcy court must take a "second look" at the validity of the employment under § 327. *In re Johnson,* 312 B.R. 801, 817-18 (E.D. Va. 2004).

The court authorized the Trustee to employ Roetzel and Fugee as her counsel under § 327(a), which states that the a trustee "may employ one or more attorneys...that do not hold or represent an interest adverse to the estate, and that are disinterested persons.... 11 U.S.C. § 327(a); *cf* 11 U.S.C. § 327(e). The employed professional must meet both standards. *Michel v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 999 F.2d 969, 971 (6th Cir. 1993). "Together, the statutory requirements of disinterestedness and no interest adverse to the estate 'serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities,'" *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir.1998) (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir.1994)), and are an ongoing responsibility of the professional during the appointment on behalf of the bankruptcy estate, *In re Big River Elec. Corp.*, 355 F.3d 415, 433 (6th Cir. 2004); *In re Cleveland Trinidad Paving Co.*, 218 B.R. 385, 389 (Bankr. N.D. Ohio 1998); *see* 11 U.S.C. § 328(c)(reference to "at any time during such professional's employment").

The Bankruptcy Code defines "disinterested person" to mean a person that "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C). While the Bankruptcy Code does not define "an interest adverse to the estate," an oft-cited and sensible definition is set forth in *In re Roberts*, 46 B.R. 815 (Bankr. D. Utah 1985), *rev'd in part on other grounds,* 75 B.R. 402 (D. Utah 1987):

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*Id.* at 827; *see In re Greystone Holdings, L.L.C.*, 305 B.R. 456, 461 (Bankr. N.D. Ohio 2003); *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir.1999); *In re Crivello,* 134 F.3d at 835; *Electro–Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 361 (11th Cir.1994).

By its plain terms, § 327(a) would bar a professional from representing a trustee if that professional currently represents or had represented a creditor of the estate. *In re Hanckel*, 517 B.R. 609, 613 (Bankr. D.S.C. 2014). Congress, however, created a carve out from § 327(a)'s general rule in subsection (c), which provides that "a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor . . ., in which case the court shall disapprove such employment if there is an actual conflict of interest." 11 U.S.C. § 327(c); *In re Johnson*, 312 B.R. at 818-21.

Under § 328(c), a bankruptcy court has discretion to deny a professional compensation and reimbursement of expenses for noncompliance with § 327. Specifically, § 328(c) provides in relevant part:

> Except as provided in section 327(c). . ., the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327. . . of this title if, at any time during such professional person's employment . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c). As § 328(c) references § 327(c) as an exception to its terms, the court lacks discretion to deny the Fee Application solely because of Roetzel's representation of creditor Fifth Third unless there is an actual conflict of interest between the two representations

Objecting Creditors argue that the Fee Application should be denied in its entirety due to Roetzel's "palpable" conflict of interest. Although not cited, the court understands Objecting Creditors to be asserting that Roetzel has an actual conflict of interest within the meaning of § 327(c). Fugee provided an affidavit that was filed with the Trustee's Motion to Employ her and the attorneys with whom she was associated at Roetzel as required by Rule 2014 of the Federal Rules of Bankruptcy Procedure. [Doc. # 32, attached affidavit]. She disclosed in her affidavit that Fifth Third was a client of Roetzel's in unrelated matters and that she had confirmed with the Trustee that in the event the Trustee has any basis to seek relief against Fifth Third, she would need to employ special counsel. [*Id.* at ¶¶ 7-8]. She further stated that a search of the firm's conflict records reflects no connection with Horvath. [*Id.* at ¶ 9]. Objecting Creditors' argument is based on the fact that Fifth Third had been and is a client of Roetzel's in unrelated matters, and on various actions taken by Fugee that Objecting Creditors contend show a potential conflict of interest

19

ripening into an actual conflict of interest.

The Bankruptcy Code does not define "actual conflict of interest" and "[c]ourts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists in light of the particular facts of each case." *In re BH & P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991). Other courts have found that an actual conflict exists where there is "an active competition between two interests in which one interest can only be served at the expense of the other," *In re Midway Motor Sales, Inc.*, 355 B.R. 26, 33 (Bankr. N.D. Ohio 2006)*; In re Hanckel*, 517 B.R. at 614; *In re Johnson*, 312 B.R. at 822, a straightforward, common sense formulation of the standard that makes sense to this court. Another circumstance logically said by other courts to show an actual conflict of interest is where the creditor is afforded a preference that is denied to the other creditors. *In re Hanckel*, 517 B.R. at 614. An actual conflict of interest is an "interest adverse to the estate" under §327(a). *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998).

Objecting Creditors point out that, shortly after commencing this case against their client, they tried to hire Fugee to represent them. But Fugee declined their request based upon an asserted conflict of interest due to Roetzel's representation of Fifth Third. She did ask that they provide her with a copy of the proposed counterclaim against Fifth Third they sought leave to file on Horvath's behalf in the foreclosure suit, which they did. [Doc. # 252, Ex 1].

According to Objecting Creditors, if Roetzel has a conflict of interest in representing them, it also has a conflict in representing the Trustee. The court disagrees. The analysis as to whether Roetzel's simultaneous representation of Fifth Third and Objecting Creditors would constitute a conflict of interest is a different analysis than whether Roetzel's representation of Fifth Third would create a conflict in also representing the Trustee. In any event, the court credits Fugee's representation to the court at a hearing on the Fee Application that she used a conflict of interest excuse to decline representation of Objecting Creditors only as a convenience but that she ultimately did not want to represent lawyers who had filed an involuntary bankruptcy petition against their client as a fee collection tool.

Next, according to Objecting Creditors, an actual conflict also exists in that Roetzel has afforded Fifth Third a preference that they have been denied. In a nutshell, Objecting Creditors argue that Fugee has entered into discussions and shared information with counsel for Fifth Third that she has not discussed or shared with counsel for Objecting Creditors. They argue that such preferential communication is shown by the fact that the Trustee did not include them in settlement negotiations that led to filing the motion to approve compromise and that, despite their subpoena duces tecum, the Trustee has asserted that certain

20

inter-party communications are privileged, including the assertion of a common interest privilege in response to a motion to compel discovery filed by the NPH Estate and NPH Trust ("NPH Defendants"). According to Objecting Creditors, asserting a common interest privilege shows a "prima facie conflict." The court finds, however, that no conflict is shown by the Trustee's assertion of privilege or Objecting Creditors being excluded from the settlement negotiations.

In their motion to compel, the NPH Defendants sought an order compelling TPIP, LLC and Tony Packo's Toledo, LLC ("the TP Defendants") and the Trustee to produce certain documents regarding communications between the TP Defendants, the State Court Receiver, the Trustee and Fifth Third, or their counsel. In their response, the TP Defendants argued that the communications between counsel for the parties are protected as privileged work product or under the common interest privilege. [Adv. No. 15-3058, Doc. # 124, p. 10]. In her response, the Trustee argued that the requested communications were not relevant to any issue before the court and that, even if relevant, they are protected by privilege "as asserted by TP Foods." [Adv. No. 15-3058, Doc. # 125, p. 8]. The Trustee further argued that to the extent the requested communications relate to the motion to approve compromise, they are privileged and not discoverable because they constitute settlement negotiations. [*Id.*]. The court did not address the privilege issues as it found the NPH Defendants' requests to be overly broad and irrelevant to any issue to be decided in the adversary proceeding.

Nevertheless, the common interest privilege is not an independent privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to third parties. *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 219 (W.D. Ky. 2006); *Falana v. Kent State Univ.*, No. 5:08 CV 720, 2012 WL 6084630, *4, 2012 U.S. Dist. LEXIS 173114, *11 (N.D. Ohio Dec. 6, 2012). "[T]he rule applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine." *United States v. Suarez*, No. 5:13 CR 420, 2014 WL 1898582, *6, 2014 U.S. Dist. LEXIS 63687, *17 (N.D. Ohio May 8, 2014) (quoting *In re Grand Jury Subpoenas*, 902 F.2d 244 (4th Cir.1990)). The common interest privilege may apply "where the parties undertake a joint effort with respect to a common legal interest." *Id.* at *19 (quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007)); *see American Mgmt. Serv., LLC v. Dept. of the Army*, 703 F.3d 724 (4th Cir. 2013)("The common interest doctrine permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims.").

Fifth Third has an interest in getting paid the money owed it by the Packo Companies pursuant to

the sale of receivership assets to the TP Defendants. Because the TP Defendants are not obligated to fund the Promissory Note owed to the Receiver and, thus, Fifth Third will not get paid by the Receiver while the appeal of the Sale Confirmation Order is pending, Fifth Third has an interest in bringing the State Court litigation to a close. The shifting recipe ownership battle has become a pervasive sticking point. Fugee's legal analysis, with which this court agreed in ruling on the summary judgment motions filed in the adversary proceeding, was that the recipe ownership claims of the NPH Defendants as well as those of Horvath, and thus the bankruptcy estate, were barred by the res judicata effect of the State Court's Recipe Order and that pursuant to that order, TPIP, LLC owns the Tony Packo recipes. That judgment is final. Given her assessment that the recipes are not assets of the bankruptcy estate, and because there is no money in the estate to prosecute the appeal, the Trustee's interests coincided with that of Fifth Third in that the estate will not be paid the money owed to Horvath by the TP Defendants until resolution of the State Court litigation. Thus, the Trustee sought a declaratory judgment as to ownership of the recipes so as to allow her to proceed with administration of the bankruptcy estate and bring the State Court litigation to a close. Asserting a common interest privilege as to communications with counsel for the TP Defendants and Fifth Third relating to these matters does not demonstrate an actual conflict of interest.

The Trustee also properly asserted a privilege with respect to documents regarding communications relating to settlement negotiations. In *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003), the Sixth Circuit Court of Appeals recognized a federal discovery privilege with respect to documents created for the purpose of furthering settlement negotiations. *Id.* at 980. The court explained:

> Parties are unlikely to propose the types of compromises that most effectively lead to settlement unless they are confident that their proposed solutions cannot be used on cross examination, under the ruse of "impeachment evidence," by some future third party. Parties must be able to abandon their adversarial tendencies to some degree. They must be able to make hypothetical concessions, offer creative quid pro quos, and generally make statements that would otherwise belie their litigation efforts. Without a privilege, parties would more often forego negotiations for the relative formality of trial. Then, the entire negotiation process collapses upon itself, and the judicial efficiency it fosters is lost.

*Id.*

As discussed above, the Trustee reasonably valued and tried to settle the State Court litigation. And to the extent they were not included in negotiations of the proposed settlement, unlike Fifth Third and the TP Defendants, Objecting Creditors are not parties to any of the litigation that was the subject of the motion to approve compromise filed by counsel for the Trustee and had no quid pro quo to offer the estate in reaching a settlement. While Objecting Creditors were not part of the settlement negotiations, they were

13-34137-maw    Doc 279    FILED 03/10/17    ENTERED 03/10/17 16:42:17    Page 22 of 24

given proper notice of the motion to approve compromise and had an opportunity to, and did, raise their objections to the proposed settlement. The court finds Objecting Creditors' argument that they were "excluded" from settlement negotiations as showing that Roetzel has an actual conflict of interest is without merit.

Objecting Creditors also argue that they provided to the Trustee the motion filed in State Court to allow Horvath to file counterclaims against Fifth Third in the foreclosure action, which remains pending, and that Roetzel even evaluating potential claims against Fifth Third is a conflict of interest. The court agrees that a claim the bankruptcy estate has against a creditor is an obvious "active competition between two interests in which only one interest can be served at the expense of the other." Fugee recognized this problem in her initial affidavit disclaiming an ability to represent the estate's interest in any claims against Fifth Third. However, there is no indication that Roetzel did in fact evaluate those claims.

The potential counterclaims, relating to tortious interference with Fifth Third's own contractual and business relationships, were never included on Horvath's bankruptcy schedules, even after he filed his amended Schedule B.[4] The Trustee, also a lawyer, testified at the hearing on the motion to approve compromise regarding her own assessment of those claims against Fifth Third. *See In re Ampal-American Israel Corp.*, 534 B.R. 569, 586 (Bankr. S.D.N.Y. 2015)("A trustee is not required to prosecute every cause of action belonging to the estate" and has "broad discretion" to decide what to prosecute); *Reed v. Cooper (In re Cooper)*, 465 B.R. 801, 812 (Bankr. N.D. Tex. 2009)(stating that a Chapter 7 trustee "is expected to be a gatekeeper and to exercise reasonable business judgment in deciding what actions to bring and what are not worth the expense."). She testified that she placed little or no value on them, relying on Horvath's own testimony at the meeting of creditors that he did not believe he had any claim against Fifth Third and on the fact that he did not include any such claim on his bankruptcy schedules, not on any evaluation of the counterclaims by Roetzel. After Horvath amended his Schedule B to include vague "potential" claims against Fifth Third for violation of unspecified banking and underwriting rules and regulations, the Trustee consulted with separate counsel regarding such claims.

Finally, the court has considered Fugee's statements in her supplemental affidavit regarding the

---

[4] It is not surprising that the counterclaims were omitted from Horvath's bankruptcy schedules since, under Ohio law, an entity cannot be held liable for inducing a breach of, or tortiously interfering with, a contract when it is a party to the contract. *Condon v. Body, Vickers & Daniels*, 99 Ohio App. 3d 12, 22 (1994) ("Tortious interference with a business contract occurs when one party to a contract is induced to breach the contract by the malicious acts of a third person *who is not a party to the contract*." (emphasis in original)); *Dorricott v. Fairhill Ctr. for Aging*, 2 F. Supp. 2d 982, 989 (N.D. Ohio 1998) ("An essential element of the tort is interference by someone who is not a party or agent of the party to the contract or relationship at issue.") Likewise, "[a] person cannot tortiously interfere with his own business relationship." *Dolan v. Glouster*, 173 Ohio App. 3d 617, 630 (2007).

small percentage of Roetzel's annual revenues that are attributed to receipts from unrelated Fifth Third matters and the minimal time she personally has billed for work on unrelated Fifth Third matters during the past approximately three years. The court does not believe that either Roetzel's or Fugee's representation of Fifth Third at that level in such unrelated matters has resulted in a predisposition of bias against the bankruptcy estate in favor of Fifth Third's interests. Having also considered Fugee's arguments and positions regarding the various issues that have arisen in this case and her efforts at resolving these issues, the court believes that she has acted in the best interests of the estate at each stage of the proceedings in the case.

Whether taken individually or collectively, the court finds no basis in Objecting Creditors' arguments and observations for a determination that Roetzel or Fugee is not disinterested or that either represents or holds an interest adverse to the estate, due to an actual conflict of interest or otherwise.

## CONCLUSION

For all of the foregoing reasons, the court finds that Roetzel's requested fees of $216,373.50 must be reduced by a total of $1,679 and that $214,694.50 is the reasonable compensation for actual, necessary services rendered by Roetzel in this case and that the actual, necessary expenses incurred by it total $4,384.39. Therefore, under § 330(a), the court will grant the First and Final Application of Roetzel & Andress for Compensation and Reimbursement of Expenses in the total reduced amount of $219,078.89.

The court will enter a separate order in accordance with this Memorandum of Decision.

###